UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JESSICA L. WEST o/b/o J.W.                  CIVIL ACTION

VERSUS                                    NO. 14-2716-SM-SS

CAROLYN COLVIN, ACTING
COMMISSIONER OF SOCIAL SECURITY

## REPORT AND RECOMMENDATION

The plaintiff, Jessica L. West ("Ms. West"), on behalf of her minor child, J.W., seeks judicial review, pursuant to Section 405(g) of the Social Security Act (the "Act"), of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act (the "Act"), 42 U.S.C. § 1382c(a)(3).

## PROCEDURAL HISTORY

On June 28, 2012, Ms. West submitted an application for SSI benefits on behalf of her minor son, J.W., who was born in 2004. The onset date was March 1, 2012. R. 103. The disabling conditions were asthma and attention deficit hyperactivity disorder ("ADHD"). R. 130. On August 21, 2012, the application was denied. R. 52-59.

On June 10, 2013, there was a hearing before an Administrative Law Judge ("ALJ"). Ms. West, her son and their counsel were present. R. 29. On June 26, 2013, the ALJ issued an unfavorable decision. R. 11-26. On September 22, 2014, the Appeals Council denied the request for review. R. 1-6.

On November 26, 2014, Ms. West filed a complaint for review of the Commissioner's decision. Rec. doc. 1. The Commissioner filed an answer and the administrative record. Rec. docs. 21 and 22. The parties filed cross-motions for summary judgment. Rec. docs. 23 and 24.

Ms. West is represented by counsel.

## STATEMENT OF ISSUE ON APPEAL

Issue.  Was there substantial evidence supporting the ALJ's decision?

## THE COMMISSIONER'S FINDINGS

The ALJ made the following findings:

1. J.W. was born in 2004.  He was a school-age child on June 28, 2012, the date the application was filed, and is currently a school-age child (20 CFR § 416.926a(g)(2)).

2. J.W. has not engaged in substantial gainful activity since June 28, 2012, the application date (20 CFR §§ 416.924(b) and 416.971 *et seq*.).

3. J.W. has ADHD which is a severe condition within the constraints of Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985) and SRR 96-3p (20 CFR § 416.924(c)).

4. J.W. does not have a condition or combination of conditions that meet or medically equal the severity of one of the listed conditions in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 416.924, 416.925 and 416.926).  Specifically, Listing 112.11 Attention Deficit Hyperactivity Disorder is not met.

5. J.W. does not have an impairment or combination of impairments that functionally equals the severity of the listings (20 CFR §§ 416.924(d) and 416.926a).

6. J.W. has not been disabled, as defined in the Act, since June 28, 2012, the date the application was filed (20 CFR § 416.924(a)).

R. 14-26.

## ANALYSIS

a.  **Standard of Review.**

The function of this court on judicial review is limited to determining whether there is substantial evidence in the record to support the final decision of the Commissioner as trier of fact and whether the Commissioner applied the appropriate legal standards in evaluating the evidence.  Perez v. Barnhart, 415 F.3d 457, 461 (5th Cir. 2005); Newton v. Apfel, 209 F.3d 448, 452 (5th Cir. 2000).  Substantial evidence is more than a scintilla but less than a preponderance

and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971); Perez, 415 F.3d at 461.  Alternatively, substantial evidence may be described as that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion.  Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  This court may not re-weigh the evidence, try the issues *de novo* or substitute its judgment for the Commissioner's.  Perez, 415 F.3d at 461; Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

The administrative law judge is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible.  See Arkansas v. Oklahoma, 503 U.S. 91, 113, 112 S.Ct. 1046, 1060 (1992).  Despite this court's limited function, it must scrutinize the record in its entirety to determine the reasonableness of the decision reached and whether substantial evidence exists to support it.  Villa v. Sullivan, 895 F.2d 1019, 1022 (5th Cir. 1990); Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).  Any findings of fact by the Commissioner that are supported by substantial evidence are conclusive.  Ripley v. Chater, 67 F.3d 552, 555 (5th Cir. 1995).

The issue is whether the claimant is "disabled" under the definition found in 42 U.S.C. § 1382c(a)(3)(C) which states:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

Id.  The regulations thereunder mandate the following three step analysis:

> We follow a set order to determine whether you are disabled.  [Step One] If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  [Step Two] If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to

3

see if you have an impairment or combination of impairments that is severe. If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further. [Step Three] If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals in severity any impairment that is listed in appendix 1 of subpart P of part 404 of this chapter. If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled. If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a). If a claimant's impairment does not meet or medically equal in severity a listed impairment, the Commissioner considers how the child functions in terms of six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1). There will be a finding of functional equivalence if there are marked limitations in two of the domains, or an extreme limitation in one domain. 20 C.F.R. § 416.926a(d). A "marked" limitation in a domain is when an impairment interferes seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation interferes very seriously with the child's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3).

b. **Testimony at Hearing.**

At the time of hearing, J.W. was eight. R. 46. He received psychiatric treatment at Midtown Clinic. He saw a psychiatrist once a month. Once a week, he saw a counselor or therapist. R. 38. He took Vyvanse and Tenex. R. 39. The Vyvanse dosage had been recently increased. R. 39. He took his medication every day. R. 45. Even with the medication, he had problems with concentration, focus and hyperactivity. R. 45. Side effects from the medication

4

included a tic disorder, movement of the mouth, touching his face and inability to keep still. R. 40.

At school J.W. liked math and social studies best. R. 46-47. He was in the third grade. R. 39. He was promoted to the next grade. R. 39. He was in special education classes. R. 39. He went to speech class twice a week. R. 40. Even with speech therapy twice a week, he had problems with his speech. R. 45. He was on a behavior modification plan at school. R. 44.

In a typical month, Ms. West received seven to ten calls from school. The teachers reported that J.W. was jumping out of his seat, he was not raising his hand, he was not paying attention, he did not want to do his work, and he was yelling out in class. R. 40-41. Sometimes Ms. West had to leave work and go to J.W.'s school. R. 41.

When J.W. and his brother were not together, they missed each other. When they were together, they wanted to push and fight each other. They were typical little boys. R. 42. He got along with some of his classmates. He had some friends in the neighborhood. They did not come over to J.W.'s house and did not call him on the phone. R. 42-43 and 47.

If Ms. West gave J.W. a chore to do at home, he objected to doing it. R. 41. J.W. would not do his homework. R. 42. He wanted to watch TV and play video games instead of doing his homework. R. 42. Sometimes he needed help with his homework. R. 42. J.W. liked to work alone. He became easily frustrated. R. 43. Even when Ms. West removed the TV and video games, J.W. had trouble listening and focusing. R. 46.

J.W. needed to be reminded about his personal hygiene. R. 43. Sometimes Ms. West had difficulty understanding him. R. 43.

    c.    **Medical Evidence**.

On August 31, 2007, J.W. was seen at a clinic for a Head Start physical. He had asthma. He had been hospitalized several times for asthma. R. 180. There was lab work. R. 172-73.

On October 9, 2007, he was seen by a medical doctor at the Central City Community Health Center ("Community Health") because he failed a hearing screen at school. He was doing "okay" in Head Start. R. 179. On October 24, 2007, he was re-screened for hearing. There was fluid behind the left ear drum. Sinus medication was prescribed. R. 175.

On March 19, 2008, he was seen by a medical doctor at Community Health because he was unable to control his bladder at school for about two weeks. He was to return in two weeks. R. 178.

On April 17, 2008, he returned to Community Health with a complaint of pink eye. The diagnosis was conjunctivitis. R. 177. On June 2, 2008, he returned for a follow-up. R. 176.

On August 20, 2008, he was seen at Community Health for a Head Start physical. There were no current problems. R. 181.

On October 27, 2008, he returned to Community Health because he failed a hearing screen. He was to return in one month. R. 187.

On January 20, 2009, he returned for a follow-up for middle ear effusion. R. 186. On February 3, 2009, he went to Community Health for a burn on his arm from a kitchen accident. R. 185.

On September 1, 2009, he returned to Community Health with complaints of fever and poor appetite. R. 182. On September 21, 2009, he reported fever, coughing and runny nose. R. 183.

On December 16, 2010, he was seen at Community Health because he failed a hearing screen at school. R. 184.

On January 27, 2012, J.W. was diagnosed with ADHD by Patrick Drennan, M.D. Medication was prescribed. R. 203.

d. **School Records**.

Because of the ADHD diagnosis, J.W. was referred to Lucinda L. DeGrange, Ph.D., a psychologist, for a psycho-educational evaluation at J.W.'s school. R. 203. A special education coordinator, a social worker, a speech-language pathologist, and J.W.'s second grade teacher also participated in the evaluation. R. 213. A report on the evaluation was released on January 30, 2012. R. 203.

J.W. had not repeated a grade and had experienced few school changes. R. 204. He had a history of asthma. He was in the second grade. His teachers reported that J.W. seemed to have decreased focus, reading and body control. His relationship with his siblings and his peers was good. He was living with his father. R. 205.

J.W. enjoyed being at school. His favorite things to do at school were to read and write. The toughest subject for him was social studies. He was functioning at the first grade level in reading. He was working at grade level in math. He was functioning on the late first grade level with writing. He had difficulty with punctuation, grammar and capitalization. R. 206. Overall, his attention to task was reasonable. R. 208.

J.W.'s overall level of achievement was average. R. 211. His academic skills and his ability to apply those skills were within the average range. His fluency with academic tasks was within the low average range. R. 211. His scores were high average in math. He had

7

significant weakness in broad written language.  R. 211.  He met the criteria for special education classification.  R. 212.

The speech-language pathologist recommended a structured program of language therapy.  R. 214-219.

On October 29, 2012 an individualized education program ("IEP") report was completed. R. 222-230.  J.W. was in the third grade.  He performed to his full potential when placed in a small group setting that minimized distractions.  He worked hard to focus his learning but had trouble focusing for long periods of time greater than five to eight minutes.  R. 222.  His behavior did not warrant a behavior intervention plan.  He would benefit from a behavior check-in/check-out plan.  R. 223.  He was reading at the beginning of the second grade level.  R. 224. He had a receptive language impairment.  R. 225.  He was performing at early second grade level in math.  R. 226.

On December 11, 2012, an IEP report was completed.  R. 234-236.  He was performing at the 2.94 grade level in Success Maker.  R. 234.  He was at the late second grade level in math. R. 235.  He was answering second grade comprehension questions with 85% accuracy.  R. 236.

On March 13, 2013, an IEP report was completed.  R. 232-33.  In math he was performing at an early to mid-third grade level.  R. 232.  A March 18, 2013 IEP report indicated the same level for comprehension questions as found on December 11, 2012.  R. 237.

A teacher assessment report was completed on April 30, 2013.  R. 240-43.  He was sometimes very irritable in the afternoons.  He constantly called out and talked when directed to be silent.  He had trouble completing tasks because he was not focused and was unwilling to follow directions.  R. 241. He wanted to do well in school but struggled to stay on task and follow instructions. He was very talkative.  R. 243.

The report of the LEAP test is dated May 17, 2013. His scores were: (1) approaching basic level in science; (2) at the basic level in social studies; (3) approaching basic level in English language arts; and (4) at the basic level in math. R. 163-64.

There is an undated behavior intervention plan. R. 220-221.

There is an undated teacher questionnaire in the record. R. 155-62. Presumably it was completed at the end of third grade (approximately May 2013), because it indicated that the teacher had known J.W. for one year and he was reading at the 2.3 grade level. R. 155. J.W. received small group instruction twice a week in reading and math. He could work independently but was easily distracted. R. 156. He often became impatient and rushed through his class work. He could be flippant and rude. R. 157. He became easily frustrated with others and preferred to work alone. R. 158.

e. **Plaintiff's Appeal**.

Issue: Was there substantial evidence supporting the ALJ's decision?

The ALJ found that J.W. had less than marked limitations in the domains of: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; and (4) caring for yourself. The ALJ found that J.W. had no limitations in the domains of: (1) moving about and manipulating objects; and (2) health and physical well-being. To functionally equal the listing, J.W.'s impairment or combination of impairments must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(d).

Ms. West argues that J.W. had marked limitations in the domains of: (1) attending and completing tasks; and (2) interacting and relating with others. If so, he would functionally equal the listing. Ms. West does not argue that J.W. has an extreme limitation in any domain.

Ms. West contends that the evidence relied upon by the ALJ is not even a scintilla of the overall evidence relevant to the two domains at issue in her appeal. She urges that the evidence overwhelmingly supports her argument that J.W. had marked limitations in the two domains.

**1. Attending and Completing Tasks.**[1]

In urging that J.W. has a marked limitation in attending and completing tasks, Ms. West cites: (1) her July 2012 report of J.W.'s failure to complete his homework; (2) accommodations required for J.W. in an October 2012 behavior intervention plan; (3) the May 2013 Leap Test Scores; and (4) the May 2013 responses of a teacher to an SSA questionnaire identifying J.W.'s activities with varying degrees of problems.

Ms. West completed a function report on July 9, 2012. R. 116 (Rec. doc. 22-6, page 4). In response to the question concerning J.W.'s ability to pay attention and stick with a limited task, Ms. West answered that J.W. kept busy on his own, finished things he started, worked on arts and crafts projects, and completed chores most of the time. R. 124 (Rec. doc. 22-6, page 12). She indicated that he did not complete his homework. Id.

---

[1] Attending and completing tasks considers how well a child is able to focus and maintain attention, and how well he is able to begin, carry through, and finish activities, including the mental pace at which he performs activities and the ease of changing activities. Attending and completing tasks also refers to a child's ability to avoid impulsive thinking and his ability to prioritize competing tasks and manage his time (20 CFR § 416.926a(h) and SSR 09-4p, 2009 WL 396033).

   Social Security rules provide that a school-age child without an impairment should be able to focus his attention in a variety of situations in order to follow directions, remember and organize school materials, and complete classroom and homework assignments. The child should be able to concentrate on details and not make careless mistakes in his work (beyond what would be expected in other children of the same age who do not have impairments). The child should be able to change activities or routines without distraction, and stay on task and in place when appropriate. The child should be able to sustain attention well enough to participate in group sports, read by himself and complete family chores. The child should also be able to complete a transition task (e.g., be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation (20 CFR § 416.926a(h)(2)(iv) and SSR 09-4p).

Ms. West contends that J.W.'s LEAP scores confirm his inability to pay attention. The May 2013 LEAP report indicates that J.W. scored at the approaching basic level in science and English language arts and the basic level in mathematics and social studies. R. 163 (Rec. doc. 22-6, pages 51-52).

The Commissioner cites to the psycho-educational evaluation of January 5, 2012 by Dr. DeGrange. A comparison of J.W.'s scores with scores earned by others at his age level demonstrated that his overall level of achievement was average. R. 198 (Rec. doc. 22-7, page 30). The same evaluation also notes that, based on his scores for his achievement areas, J.W. demonstrated significant strength in broad mathematics and significant weakness in broad written language. Id. While the contrast between J.W.'s leap scores in math and English is also found in the evaluation by Dr. LaGrange, the contrast does not demonstrate a marked inability to pay attention. It simply reflects strength in math and weakness in English. Dr. DeGrange found that J.W.'s attention to task was reasonable. R. 195 (Rec. doc. 22-7, page 27).

On or about October 29, 2012, when J.W. was in the third grade, a behavior intervention plan was completed at the Arthur Ashe School. R. 220-230 (Rec. doc. 22-7, pages 52-62). Ms. West cites the accommodations that the plan concluded were needed for J.W., including assignment of preferential seating, small group instruction and testing, an increase in time allowed to complete tasks and take quizzes, breaks during work periods, and modification of assignments as needed. R. 227 (Rec. doc. 22-7, pages 59). The plan also recorded that:

> [J.W.] performs to his full potential when placed in small group settings that minimize distractions. [He] works hard to focus on his learning but has trouble focusing for long periods of time greater than five to eight minutes. He benefits greatly from being allowed to take breaks during class in order to jump-start his attention to re-focus. He also is extremely hyper active during instructional times of class. He has trouble staying still and quiet and keeping his attention to his teacher. He is a very varied learner and learns best in many modalities such as oral, visual and kinesthetic.

R. 222 (Rec. doc. 22-7, page 54). J.W. was expected to make progress in the general education curriculum with the appropriate accommodations and modifications. Id.

After the completion of the behavior intervention plan, there were progress reports during the third grade. On December 10, 2012, it was noted that he was performing at an early to mid-third grade level in math. The teacher noted that he regularly mastered five new skills per week in his small group math class. He was a pleasure to teach. R. 235 (Rec. doc. 22-7, page 67). On December 10, 2012, he was making progress in speech-language therapy. R. 236 (Rec. doc. 22-7, page 68). On December 11, 2012, J.W. was described as working hard in guided reading. His effort and behavior were improved. R. 234 (Rec. doc. 22-7, page 66).

On March 13, 2013, the progress report on math was similar to the December 10, 2012 report. J.W. was making very good progress. R. 232 (Rec. doc. 22-7, page 64). On March 18, 2013, he was making progress in speech-language therapy, but he had attentional and focusing problems in the past few weeks. R. 237 (Rec. doc. 22-7, page 69) On March 19, 2013, it was reported that he was reading at the 2.4 grade level. He worked hard on his guided reading. He made progress in his reading comprehension and writing ability. R. 231 (Rec. doc. 22-7, page 63).

On April 30, 2013, Vanderbilt Assessments were completed by J.W.'s math and social studies teachers. R. 240-43 (Rec. doc. 22-7, pages 72-75). The math teacher noted that J.W. wanted to do well in school, but struggled to stay on task and follow instructions. He was very talkative. R. 243 (Rec. doc. 22-7, page 75). J.W. very often had difficulty keeping attention to what needed to be done and very often he fidgeted with his hands. R. 242 (Rec. doc. 227, page 74). The assessment by the social studies teacher reflected more frequent occurrence of

symptoms than the math teacher's assessment.  Compare R. 240 and 242 (Rec. doc. 22-7, pages 72 and 74).

A teacher questionnaire was completed at the end of the third grade.[2]  For the section on attending and completing tasks, the teacher indicated that there were three activities without problems: (1) paying attention when spoken to directly; (2) sustaining attention during play and sports; and (3) carrying out single step instructions.  There were six activities with only a slight problem:  (1) refocusing to task when necessary; (2) carrying out multi-step instructions; (3) changing from one activity to another without being disruptive; (4) organizing his own things or school materials; (5) completing homework assignments; and (6) working at reasonable pace and finishing on time.  There were four activities that were indicated as obvious problems:  (1) focusing long enough to finish assigned activity or task; (2) waiting to take turns; (3) completing work accurately without careless mistakes; and (4) working without distracting self or others.  The teacher added that he:  (1) often became impatient and rushed through his class work; and (2) could be flippant and rude.  No activity was described as a serious or very serious problem.  R. 157 (Rec. doc. 22-6, page 45).

Ms. West contends that the May 2013 teacher questionnaire responses demonstrate that J.W. had a marked limitation in the attending and completing tasks domain.  She cites the problem with homework assignments, the obvious problems with four activities, and the note that J.W. became impatient and was rude.  Rec. doc. 23 (Memorandum, pages 3-4).

---

[2]  The hearing before the ALJ was on June 10, 2013.  R. 29.  At the hearing, J.W. was in the third grade and was promoted to the next grade.  R. 39.  Because the teacher questionnaire states that the teacher knew J.W. for a year and was reading at the 2.3 level (R. 155), it is assumed that the questionnaire was completed at the end of the third grade.  It is sometimes hereafter referred to as "May 2013 teacher questionnaire."

The ALJ cites the same responses to the teacher questionnaire as evidence that J.W. had less than marked limitations in the domain. R. 21. The Commissioner argues that because the response by the teacher did not indicate that there were any activities where J.W. had a serious or very serious problem, the teacher's response does not indicate that J.W. had a marked limitation in this domain. The regulations state that a marked limitation in a domain will be found when the claimant's "impairment(s) interferes <u>seriously</u> with ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be <u>seriously</u> limited when. . . ." 20 C.F.R. § 416.926a(e)(2)(i) (emphasis added).

Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. <u>Perez</u>, 415 F.3d at 461. The record clearly demonstrates substantial evidence to support the ALJ's finding that J.W. had a less than marked limitation in the domain of attending and completing tasks. Ms. West's argument is an attempt to have the Court re-weigh the evidence, which is not permitted. <u>Id</u>.

2. **Interacting and Relating to Others**.[3]

In finding that J.W. had a less than marked limitation in the domain of interacting and relating with others, the ALJ relied, in part, on: (1) the respect and courtesy he demonstrated to

---

[3] Interacting and relating with others relates to all aspects of social interaction at home, at school, and in the community. Because communication is essential to both interacting and relating, this domain considers the speech and language skills children need to speak intelligibly and to understand and use the language of their community (20 CFR § 416.926a(i) and SSR 09-5p, 2009 WL 396026).

The preschool child should be able to begin to prefer playmates and start developing friendships with children who are his own age; use words instead of actions to express himself; be better able to share; show affection initiate and participate in conversations; use increasingly complex vocabulary and grammar; and speak clearly enough that both familiar and unfamiliar listeners can understand what he says most of the time (20 CFR 416.926a(i)(2)(iii) and SSR 09-5p). The school-age child should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand (20 CFR § 416.926a(i)(2)(iv) and SSR 09-5p).

elders and others; (2) his behavior at home; (3) his friends and acceptance by others; (4) the absence of any confrontations with the law; (5) his performance in academic settings; and (6) his emotional responses to situations, including the hearing. R. 22-23.

A preliminary issue concerns Ms. West's credibility. She urges that the ALJ questioned her credibility and improperly disregarded her statement that she had difficulty understanding J.W. Rec. doc. 23 (Memorandum, page 5).[4]

At the hearing, Ms. West's counsel asked how many calls she received in a typical month from the school concerning J.W.'s behavior. She answered between seven and ten calls. She reported that the teachers called saying that, "he's jumping out of his seat, he's not raising his hand, he's not paying attention, he don't want to do his work, he's yelling out in class, and they have a place where, he goes to charter school, so they have a place where they send him to ISS. . . ." R. 40-41. Ms. West reported that she was required to leave work to go to school in regards to his behavior. R. 41.

The ALJ stated that Ms. West's statements regarding the intensity, persistence and limiting effects of J.W.'s symptoms were not entirely credible. After a reference to a behavior modification plan, the ALJ stated:

> There is no evidence of behavior of such severity as to warrant suspension or expulsion. <u>Assertions by claimant's mother of her being called from her work are not credited</u>. Particularly, in light of her own quest for disability.

R. 18 (emphasis added).

Ms. West also testified that, "[s]ometimes I can understand clearly what he's saying, and sometimes I can't." R. 43. Ms. West contends that the ALJ improperly disregarded this statement as not credible because she was pursuing her own disability claim. Rec doc. 23

---

[4] Ms. West's entire argument on the issue of whether J.W. possessed a marked limitation in the domain of interacting and relating with others appears on page 5 of her memorandum.

(Memorandum, page 5). Ms. West mischaracterizes the ALJ's decision. Ms. West's testimony regarding the frequency of being called from work by J.W.'s school was not credited by the ALJ. The ALJ's statement on credibility did not refer to Ms. West's statement regarding her inability to understand J.W. at times.

Ms. West's challenge to the ALJ's finding that J.W. had a less than marked limitation in the domain of interacting and relating to others concerns several reports: (1) the January 30, 2012, psycho-educational evaluation completed by Dr. DeGrange [R. 203-213 (Rec. doc. 22-7, pages 35-45)]; the July 19, 2012 child function report completed by Ms. West [R. 114-125 (Rec. doc. 22-6, pages 2-13)]; the October 29, 2012 individualized education program [R. 222-230 (Rec. doc. 22-7, pages 54-62)]; and the May 2013 teacher questionnaire [R. 155-162 (Rec. doc. 22-6, pages 43-50)].

On January 30, 2012, Dr. DeGrange headed a team that completed a psycho-educational evaluation. J.W. was in the second grade. R. 203-213 (Rec. doc. 22-7, pages 35-45). One part of the report is headed "Emotional/Behavioral/Attention Functioning. R. 210-211 (Rec. doc. 22-7, pages 42-43). J.W. was rated on a standardized scale referred to as "Behavior Assessment System for Children – Second Edition (BASC-2)". A score in the At-Risk/Borderline range identified either a significant problem that may not be severe enough to require a formal treatment or the potential of developing a problem that needed careful monitoring. R. 210 (Rec. doc. 22-7, page 42). For the adaptive scale of functional communication (expressing himself in a way that others can easily understand), the teacher reported that J.W. was at-risk. Ms. West cites the teacher's finding. While the finding identified a significant problem or one needing careful monitoring, it does not demonstrate a _serious_ limitation as required for a finding of a marked limitation. 20 C.F.R. § 416.926a(e)(2).

16

Dr. DeGrange's team, included Erin Woods, a speech pathologist. R. 213-219 (Rec. doc. 22-7, pages 45-51). Ms. Woods completed a speech-language evaluation. A communication sample was collected and analyzed. In three categories (semantics; syntax/morphology; and pragmatics/conversational discourse), aspects were evaluated as either adequate or inadequate. R. 216-217 (Rec. doc. 22-7, pages 48-49).

Ms. West cites each of the inadequate categories, for example ability to define words, and concludes that: (1) they support that he was at-risk in the area of functional communication; and (2) they indicate that J.W. exhibited a speech disorder.[5] Rec doc. 23 (Memorandum at 5).

The analysis by the speech pathologist stated:

> [J.W.] does exhibit a communication disorder in the area of receptive and expressive language and does qualify for speech-language pathology services. . . . This disorder is characterized by deficits in the areas of listening comprehension, semantics, syntax, auditory memory, and auditory processing, and pragmatics. This disorder adversely affects [J.W.'s] educational performance and access/progress in the general curriculum. Receptive and expressive language skills are required to be a successful learner. Without speech/language therapy services, [J.W.] is not expected to make adequate progress in the general education curriculum.

R. 218 (Rec. doc. 22-7, page 50). At the time of the hearing, J.W. went to speech therapy twice a week. R. 40.

The Function Report – Child Age 6 to 12th Birthday was completed by Ms. West on July 19, 2012. R. 114-125 (Rec. doc. 22-6, pages 2-13). In response to whether the child's ability to communicate was limited, Ms. West answered "not sure." R. 119 (Rec. doc. 22-6, page 7). The form prompted Ms. West to indicate what J.W. did or could do for certain categories. Ms. West indicated "no" for delivering messages to the family and other categories. She indicated that he

---

[5] In addition to the ability to define words, the other aspects found in the speech language evaluation as inadequate were: (a) semantics: expressive vocabulary/word classes; word-finding/retrieval; and sentence meaning; (b) syntax/morphology: sentence types; sentence complexity; and morphology; and (c) pramatics/conversation discourse: topic maintenance, repair and closure; relevance of response; and response time. R. 216-17 (Rec. doc. 22-7, pages 48-49).

17

did talk with the family.  Id.  For Dr. DeGrange's January 30, 2012 psycho-educational evaluation, J.W.'s father scored him within normal limits in his ability to adjust or adapt to changes in routine, interact with peers, get along with others, function in a leadership role and express himself in a way that others can easily understand him.  R. 210-211 (Rec. doc. 22-7, pages 42-43).

On October 29, 2012, an Individualized Education Program form was completed.  R. 222-230 (Rec. doc. 22-7, pages 54-62).  The speech pathologist participated.  It was noted that J.W. had a language impairment and qualified for speech and language services.  R. 222 (Rec. doc. 22-7, page 54).  The language area of the report noted that "[J.W.] presents with a receptive language impairment characterized by deficits in the areas of listening comprehension, semantics (vocabulary), and syntax (grammar).  R. 225 (Rec. doc. 22-7, page 57).

A teacher questionnaire was completed in May 2013.  R. 155-62 (Rec. doc. 22-6, pages 43-50).  The teacher reported that she was with J.W. twice a day for 45 minutes each time.  She had known him for a year.  R. 155 (Rec. doc. 22-6, page 43).  Under the domain of interacting and relating with others, the teacher answered that she could understand almost all of J.W.'s speech on the first attempt whether the topic was known or unknown.  R. 159 (Rec. doc. 22-6, page 47).  In the domain of interacting and relating with others, school age children are expected to be able to talk to people of all ages and speak in a manner that both familiar and unfamiliar listeners readily understand.  20 C.F.R. 416.926a(i)(2)(iv).  Even though Ms. West sometimes could not understand J.W., his teacher reported that she could understand almost all of his speech.

The teacher was asked to rate 13 activities on a scale of one to five.  Six of the 13 activities were rated as not a problem.  Two of the activities (asking permission appropriately,

and taking turns in a conversation) were rated a slight problem. The remaining five activities were rated an obvious problem. The obvious problem activities were: (1) playing cooperatively with other children; (2) seeking attention appropriately; (3) expressing anger appropriately; (4) following rules; and (5) respecting and obeying adults in authority. The teacher noted that J.W. was on a behavior improvement program the year before and he became easily frustrated with others and preferred to work alone. R. 158 (Rec. doc. 22-6, page 46).

Ms. West cites the portions of the teacher's response concerning the obvious problem activities. Rec. doc. 23 (Memorandum, page 5). The Commissioner responds that the teacher did not rate any of the activities as a serious problem or a very serious problem. Rec. doc. 24 (Memorandum, pages 11-12). The teacher's response does not demonstrate a serious limitation as required for a finding of a marked limitation. 20 C.F.R. § 416.926a(e)(2)(i).

In January 2012, it was determined that J.W. had a problem expressing himself in a way that others could easily understand him. R. 210-11 (Rec. doc. 22-7, pages 42-43). The speech pathologist found that J.W. exhibited a speech disorder and that he was not expected to make adequate progress in the general education curriculum without speech/language therapy. R. 218 (Rec. doc. 22-7, page 50). Thereafter he received speech therapy and was promoted from the second grade to the third grade and then to the fourth grade. R. 39-40 (Rec. doc. 22-2, page 40-41). By the end of the third grade J.W.'s teacher reported that she could understand almost all of his speech. The teacher did not rate any of the activities in the domain of interacting and relating to others as presenting serious or very serious problems. She found no problems in areas relating to language, for example using adequate vocabulary and grammar to express thoughts and ideas in general everyday conversation. R. 158 (Rec. doc. 22-6, page 46).

There is substantial evidence to support the ALJ's finding that J.W. had a less than marked limitation in the domain of interacting and relating with others.

## RECOMMENDATION

Accordingly, IT IS RECOMMENDED that: (1) the cross-motion of the defendant, Carolyn W. Colvin, Acting Commissioner of Social Security Administration ("Commissioner"), for summary judgment (Rec. doc. 24) be GRANTED; and (2) the motion of the plaintiff, Jessica L. West o/b/o J.W., for summary judgment (Rec. doc. 23) be DENIED.

## OBJECTIONS

A party's failure to file written objections to the proposed findings, conclusions and recommendations in a magistrate judge's report and recommendation within fourteen (14) calendar days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

New Orleans, Louisiana, this 7th day of October, 2015.

_____
SALLY SHUSHAN
U.S. Magistrate Judge